PER CURIAM:
Nelson Gongora was convicted in Texas state court for capital murder and sentenced to death. After the state court denied habeas relief, Gongora petitioned the district court for relief under 28 U.S.C. § 2254, requesting that his conviction and sentence be set aside and a new trial ordered. The district court denied relief. We granted a certificate of appealability (COA) on two issues: (1) whether Gongora is entitled to habeas relief because the prosecutor commented during his closing argument on Gongora’s failure to testify; and (2) whether, in light of the Supreme Court’s holding in Tison v. Arizona,[1] Gongora could be sentenced to death based on a jury finding that he anticipated murder would result from his participation in robbery of the victim.[2] We find that the extraordinarily extensive comments on Gongora’s failure to testify resulted in actual prejudice, and we GRANT Gongora’s habeas petition and vacate his conviction.
I.
Texas charged Nelson Gongora with capital murder for the killing of Delfino Sierra during the course of a robbery. Although the indictment charged that Gon-gora shot Sierra, at trial, the State sought to convict Gongora either as the shooter or under the alternate theory that Gongora was a participant in a robbery in the course of which Sierra was murdered by one of Gongora’s co-defendants, Albert Or-osco. The jury heard sharply conflicting evidence regarding Gongora’s role in the offense, including evidence that the shooter may have been someone other than either Gongora or Orosco.
The State’s first witness, Sonia Ramos, told the jury that she was driving on the night of April 7, 2001 when she noticed three Hispanic men walking on the side of the road; the man in the middle (Sierra) had on a cowboy hat. As she turned to look toward a friend’s house, she saw the man on the left shoot Sierra. She then looked back, and saw a van parked in a driveway with its reverse lights on. The man who had been on the right side of Sierra ran “like he was running towards the van,” and the man who shot Sierra “kind of backed up” and “kind of looking to what he had done ... then turned around like to go towards the van.” Ramos could not see the mens’ faces.
Juan Vargas was the State’s next witness. Vargas also had been indicted for *271 Sierra’s murder. Vargas admitted that he was the driver of the van. Arrested about three weeks after Sierra’s shooting, he gave a sworn, written statement to police identifying James Luedtke and Carlos Al-manza as the two who had emerged from the van to rob Sierra and identifying Al-manza as Sierra’s shooter. Police interviewed him again a few weeks later. This time, Vargas identified Gongora as the shooter. He said that it was in fact Gon-gora and Orosco, and not Almanza and Luedtke, who had approached Sierra. At trial, Vargas testified that he had initially lied to the police when he identified Al-manza and Luedtke because he feared retaliation from Gongora. But that fear was apparently soothed by his plea agreement. Under that agreement, in exchange for pleading guilty and testifying against Gon-gora, Vargas would receive a twenty-three year sentence for Sierra’s murder and not be prosecuted at all for a second shooting.
With plea agreement in hand, Vargas testified that on the night of April 7, 2001, he was driving his van accompanied by Gongora, Almanza, Albert Orosco, Steven Gongora (“Steven”), and Luedtke (“Guero”) when they saw Sierra walking down the street and decided to rob him. Gongo-ra, Almanza, and Vargas had all taken heroin earlier in the evening. Vargas told the jury that when he pulled over, Gongora and Orosco jumped out of the van, ran toward Sierra, and demanded his money. When Sierra began to run, Gongora shot him in the head with a .38 caliber handgun that belonged to Vargas. Vargas said he had given the gun to Gongora earlier in the night for protection. Gongora and Orosco then returned to the van. Vargas asked what Gongora did, and Gongora said “I had to do what I had to do” and told everyone to remain silent. The group then returned to Gongora’s house for a cookout.
Vargas and Gongora were leaders in the criminal street gang Puro Li’l Mafia (PLM). Vargas testified that about two and a half hours after Sierra’s shooting, Almanza became a member of PLM by doing a drive-by shooting. Vargas was the driver for that shooting, and Gongora was in the van as well. Vargas testified that the shooting by Almanza was in retaliation for drive-by shootings at Gongora’s house. During the shooting, Gongora stood outside the van armed with a nine-millimeter handgun. The victim of this shooting survived. Vargas admitted that he was high on heroin and intoxicated with beer at the time of both shootings and that this impaired his ability to recall how things happened.
Several months after Vargas revised his account of Sierra’s shooting, police interviewed Dylan Griffith, who met with the group in Vargas’s van after Sierra’s shooting. At trial, Griffith, a defense witness, testified that when Vargas’s van pulled up Vargas was yelling at somebody, apparently Orosco, “because they were having a conflict over something.” When Orosco emerged from the van, he had a .38 in his waistband and was bragging about killing someone, saying, “I shot some wet back.” Griffith asked why Orosco did that and Orosco said they had tried to rob the person. Griffith then asked what they got from the robbery and Orosco said, “Nothing. I done took his soul and his dreams. That’s all I want.”
After Griffith was first interviewed by the police, he got in touch with James Luedtke (“Güero”) and told him the police were trying to locate “Güero.” Luedtke asked what the police wanted and Griffith said they just wanted a statement of what happened. Griffith testified that Luedtke then said, “So all I got to do is write down Albert shot him?” Griffith said, yes, if that was what happened, and Luedtke *272 said: “I ain’t — I ain’t going down for it. I’ll put it on whoever I got to, as long as I don’t go down for it.” Luedtke seemed frightened of being arrested.
At trial, Luedtke was called as a witness for the prosecution. Police officers did not talk to Luedtke until six months before trial. He was scared when he first talked to the investigator, fearing a charge of capital murder. Luedtke told police and later testified that Orosco had said “Let’s get this guy,” and that Gongora and Oros-co then approached the man and Gongora “told him pretty much ‘casa la febio,’” which, according to Luedtke, meant “Give me your money.” Luedtke stated that he was in the back — in the third row — of the van when this happened, but that he was able to hear because the side windows of the van were down. Luedtke testified that he saw Gongora pull a gun, and that when Orosco and Gongora returned to the car, Gongora said “I took his dreams,” apparently bragging. Gongora also said: “Nobody say nothing. Nobody seen nothing. Nobody heard nothing.” Luedtke said that Gongora and Orosco were behind the victim and Gongora was on the right and Orosco on the left. The day of Sierra’s shooting, Luedtke had been doing drugs (heroin and pot) and drinking.
Ramiro Enriquez, a defense witness who had been in prison with Vargas and Al-manza, testified that Almanza told him that Almanza and two others had gotten out of Vargas’s van and approached Sierra, and that Almanza had done the shooting. Almanza told Enriquez that he was standing over the victim and the other two people came up and said something to the effect of “Hey, let’s go, go, go.”[3]
The jury also learned of Gongora’s written statement, which he gave after he was arrested about two-and-a-half months after Sierra’s murder. He wrote:
We passed [Sierra] up and pulled into a little store before [Sierra] passed the railroad tracks. We did a U-turn in the parking lot and went back towards the guy was walking.... All we wanted to do is get a little money and go about our business. Next thing I remember, the side door opened, all of us ... were going to get out. Then there were gunshots. I turned around and saw the guy that was wearing the cowboy hat laying on the ground. I think there was about three fast shots fired. Right after the shots, all of us jumped back in the van and we left.
Gongora stated that he did not know who fired the shots.
Both Orosco and Almanza invoked their Fifth Amendment right against self-incrimination and gave no testimony before the jury.
II.
The trial court instructed the jury that it could convict Gongora if it found the evidence established beyond a reasonable doubt that Gongora shot Sierra during the course of a robbery; or that Gongora entered into a conspiracy with Orosco to rob Sierra, that Orosco shot Sierra during the *273 course of that attempted robbery, that the shooting was in furtherance of the conspiracy, and that Gongora should have anticipated the shooting. The jury found Gongora guilty, and he was ultimately sentenced to death. The CCA affirmed Gongora’s conviction and sentence on direct appeal.[4] Gongora’s state habeas petition was rejected by the state trial court, and the CCA affirmed the trial court’s decision.[5]
In February 2007, Gongora filed the underlying 28 U.S.C. § 2254 petition for a writ of habeas corpus in the district court, claiming that constitutional errors infected both his trial and sentencing proceedings. The district court denied relief,[6] and we granted a COA on two issues: (1) Gongo-ra’s claim that comments by the prosecutor during closing argument violated his Fifth Amendment right not to testify and resulted in actual prejudice, and (2) his claim that the imposition of the death penalty in his case would violate his right to due process of law and to be protected from cruel and unusual punishment under the Eighth and Fourteenth Amendments and Tison v. Arizona.[7] We ultimately do not reach the second issue.
III.
We review Gongora’s habeas petition under the deferential standard of review provided in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under 28 U.S.C. § 2254(d), when a habeas claim has been adjudicated on the merits in the state courts, federal habeas relief may not be granted unless the federal habeas court finds that the state court’s decision was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court” or was “based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.”[8]
A legal principle is “clearly established” only when it is embodied in a holding of the Supreme Court.[9] For purposes of § 2254(d)(1), a state court decision “involves an unreasonable application of th[e] Court’s clearly established precedents if the state court applies th[e] Court’s precedents to the facts in an objectively unreasonable manner.”[10] The Supreme Court has repeatedly admonished that “an unreasonable application of federal law is different from an incorrect application of federal law.”[11] Thus, “a federal *274 habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.”[12] “A state court’s determination that a claim lacks merit precludes federal habeas relief so long as ‘fairminded jurists could disagree’ on the correctness of the state court’s decision.”[13] Within the AEDPA framework, we review the district court’s conclusions of law de novo.[14]
IV.
We now turn to Gongora’s Fifth Amendment claim. In Griffin v. California, the Supreme Court held that “the Fifth Amendment ... forbids either comment by the prosecution on the accused’s silence or instructions by the court that such silence is evidence of guilt.”[15] The Court has since clarified that comment on a defendant’s silence is permissible in some instances, as where “the prosecutor’s reference to the defendant’s opportunity to testify is a fair response to a claim made by defendant or his counsel.”[16] But the rule is unchanged that a prosecutor “may not treat a defendant’s exercise of his right to remain silent at trial as substantive evidence of guilt.”[17] A Griffin error is subject to harmless error analysis.[18] On direct appeal, a state court cannot hold harmless a Griffin error unless the court is “able to declare a belief that [the violation] was harmless beyond a reasonable doubt.”[19]
Our evaluation of a Fifth Amendment claim like Gongora’s proceeds in two steps. First, we must decide under 28 U.S.C. § 2254(d)(1) whether fairminded jurists could disagree that a Griffin error occurred.[20] We must then decide whether the Fifth Amendment violation was harmless.[21] When a state court on direct appeal has determined under Chapman that a Griffin error was harmless beyond a reasonable doubt, a petitioner cannot obtain federal habeas relief based merely on a finding, per AEDPA, that no jurist could reasonably conclude that the Fifth Amendment violation was harmless beyond a reasonable doubt. Rather, applying the standard set forth by the Supreme Court in Brecht v. Abrahamson,[22] the federal court must determine whether the Fifth Amendment violation “had substantial and injurious effect or influence in determining the jury’s verdict.”[23]
*275 Here it appears the CCA did not apply Chapman and made no finding that any Fifth Amendment violation was harmless beyond a reasonable doubt. Regardless, Gongora must still clear the hurdle of Brecht: We “assess the prejudicial impact of [the prosecutor’s comments on Gongo-ra’s silence] under the ‘substantial and injurious effect’ standard set forth in Brecht, whether or not the state appellate court recognized the error and reviewed it for harmlessness under ... Chapman.”[24]
A.
During closing argument at the guilt-innocence phase of Gongora’s trial, the prosecutor made the following relevant comments (emphasis added):
[PROSECUTOR:] ... I want to talk about the people you heard from.... Who did you expect us to bring to you? There’s six people inside that van. When you look at it, here it is. Who would you expect for us to give to you to establish who the shooter is? Are you going to be satisfied in a case with gang members just looking at one person, even though he’s telling you the exact truth, no matter what? Even if the time that he first told this story, he told the truth — he told the truth about someone he’s scared to death of — this is James Luedtke. He had nothing against him. He had no crime pending. He had no reason to hide the truth. He had no reason to talk to us, but he told us the truth.
You listen to people inside there. Who else would you want to hear from, though? The shooter? We’re not going to talk to that person. We’re not going to make a deal with that person. This person deserves what they get. This person right here—
[Pointing to Gongora’s name on a chart.]
Nelson Gongora, the shooter. That’s the person on trial. That’s the person who deserves to be found guilty of capital murder.
Who should we go ahead and talk to? Who should we go ahead and present to you? Should we talk to the shooter? Should we talk to—
[DEFENSE COUNSEL:] Your Honor, I’m going to object. That’s a comment on the failure to testify.
[PROSECUTOR:] Let me make that clear. I don’t mean talk to the shooter. What I mean is this. Who—
Defense counsel then asked for a ruling on the objection, and the trial court sustained it; defense counsel then asked for a curative instruction:
[DEFENSE COUNSEL:] Could we get an instruction to the jury to disregard that comment?
THE COURT: Jury will so disregard.
[DEFENSE COUNSEL:] Move for mistrial, your honor.
THE COURT: Denied.
[PROSECUTOR:] Let me say this. And I don’t want to give the wrong impression in any sort of way. We’re asking, who do you expect to take the stand? Who do you expect to hear from, right?
[DEFENSE COUNSEL:] Your Honor, I object. That’s a continuation of the previous comments, and I, again, object to commenting on the failure to testify.
*276 The court again sustained Gongora’s objection to the prosecutor’s comment, granted his request to instruct the jury to disregard the comment, and overruled his motion for a mistrial. The prosecutor continued:
[PROSECUTOR:] I don’t want — to make it clear, /all, Defendant has a Fifth Amendment right not to testify. And, of course — and I don’t want to give any wrong impression on that whatsoever. Okay?
What I want to talk about is this. When you talk about the credibility of a person, I wish you — and I made a — I made a big mistake there. I’ll make it very clear. I’m not talking about, do you want to hear from him, because you can’t do that.
[DEFENSE COUNSEL:] Your Honor, again, I’m going to object. It’s on the same continuing subject matter. We object to comment on the failure ... to testify.
THE COURT: As to that particular statement, overruled.
[PROSECUTOR:] Let me back up and tell you this. Let me define it by the roles in the car. That’s what I’m trying to get at. Okay?
The roles in the car are this.... And then you have a person inside the car who is the Defendant’s brother, right? Where is that person? We know the person was there. They could have brought that person, but you never heard from that person. And that’s—
[DEFENSE COUNSEL:] Your Honor, I’m going to object as to what that person is and ask to approach the bench to make a record.
THE COURT: Counsel approach.
(At the bench, on the record:)
[DEFENSE COUNSEL:] I’ll be brief. Judge, our objection is that we issued bench warrants and subpoenas. We asked to have people brought in. They took the Fifth. And when he says “that person,” that diagram is still up there showing Albert [Orosco] and everybody else, and that is an improper comment, and it’s not invited.
[PROSECUTOR:] Judge, I’m trying to correct that right now to make it better in terms of I’m just talking about the roles of the persons involved.
THE COURT: All right. Sustain the objection, Counselor.
[PROSECUTOR # 2:] Excuse me. Let me make one comment for the record also.
Immediately — what [the prosecutor] was talking about there, so it’s clear for the record, was that he mentioned the name “Steven Gongora.” He mentioned the name, and he said, “The Defendant’s brother.” And he said, “Where is that person?”
Steven Gongora is the Defendant’s brother, and his name is also on the chart, and that’s what he was talking about.
THE COURT: All right. You need to clear it up, Counselor.
[PROSECUTOR:] I will.
Defense counsel then asked if his objection was sustained. The trial court sustained the objection and, on request of defense counsel, instructed the jury to disregard the comment. The trial court then overruled appellant’s motion for mistrial. The prosecutor continued:
[THE PROSECUTOR:] Ladies and gentlemen, I want to wrap this up, because that’s what I’m talking about, the confusion in the case.
When I — when you’re talking about the people inside the car, this is it. You have the person inside the van and, from all the testimony, established one person *277 is the shooter. You have a person in the car who got out and could possibly have stopped the killing from ever taking place. You have a person inside the car, by the testimony, you all know was involved in another shooting later that night. You have a person in the car who was related to the Defendant. That is his brother. Right? Then you have a person inside there who is just present. Okay?
Those are the different roles of the persons inside the car. You ask who — you know, you hear from this case, and who should — you know, how to determine the credibility. Who do you want to hear from? Who do you expect to hear from? The person who wasn’t involved at all, that had nothing at all, just present during that deal? Of course, you hear from that person.
When you’re considering and evaluating the credibility of the next person — and that’s who I’m talking about in talking about who you’re going to hear from. I’m talking about, when listening to Juan Vargas, there’s different people who played different roles. When you consider the fact that we actually spoke to him, that’s what I’m talking about. I’m not talking about who would you want to hear from, who would you expect us to call, but I meant to define it in the terms of the roles of those involved in the ease. Okay?
That’s what I wanted you to consider. That’s what I was trying to discuss about the different roles and who you would expect to hear from or expect us, you know, to be looking at. That was it. Just examine their roles.
In its opinion rejecting Gongora’s claims on direct appeal, the CCA admitted that “the prosecutor’s actual comments tended to be inartful and often confusing,” but stated that, “viewed in context, the complained-of comments appear to be the prosecutor’s attempt to comment on appellant’s failure to produce witnesses other than appellant, which is a permissible area of comment.”[25] The CCA concluded that the record showed “the prosecutor’s comments were not so blatant that they rendered the instructions to disregard ineffective” and held that “the judge reasonably concluded that the instructions to disregard effectively removed any prejudice caused by the prosecutor’s comments.”[26]
The federal district court reviewing Gongora’s § 2254 petition found that the prosecutor’s comments constituted constitutional error because the prosecutor intended to comment on Gongora’s silence and that “the character of the remarks were such that the jury would necessarily construe them as comments on Gongora’s silence.”[27] Nonetheless, the district court found the error to be harmless, concluding that “there [was] no evidence ... of a nexus between the prosecutor’s improper remarks during argument and the jury’s decisions” and presuming that the jury followed the cautionary and curative instructions given by the trial court.[28]
B.
1.
At the first step of our analysis, we agree with the district court that Gon-gora has met his burden of showing a constitutional violation. The prosecutor repeatedly referred to Gongora’s failure to testify, and whatever the prosecutor’s subjective intent in making the remarks, “the *278 character of the remark[s] [was] such that the jury would naturally and necessarily construe [them] as ... comment[s] on the defendant’s silence.”[29] Indeed, the state no longer maintains that the prosecutor’s comments on Gongora’s failure to testify did not violate the Fifth Amendment. To the extent that the CCA reached a contrary conclusion, it unreasonably applied the clearly established federal law of Griffin and its progeny.[30] To conclude otherwise empties all meaning of this cornerstone of rights upon which our criminal justice system rests. Its very centrality renders it a primer rule — etched in the minds of all players in a criminal case. Single episodic violations will creep in, but repeated and direct violations are both inexplicable and inexcusable. Certainly not excusable by ignorance or inexperience, as we will explain.
2.
At the second step, we assess the prejudicial impact of this constitutional error, applying the standard set forth in Brecht. We make this assessment “in light of the record as a whole.”[31] As the Supreme Court has explained, the Brecht standard does not require the petitioner to establish that it is more likely than not that the constitutional violation resulted in actual prejudice: ‘When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had ‘substantial and injurious effect or influence in determining the jury’s verdict,’ that error is not harmless. And, the petitioner must win.”[32] Several factors are relevant to this inquiry, including whether the comments were “extensive,” whether “an inference of guilt from silence [was] stressed to the jury as a basis for conviction,” and whether “there is evidence that could have supported acquittal.”[33] We also consider the effect of any cautionary or curative instruction given to the jury.[34] Considering each of these factors, we conclude that the error was not harmless under Brecht.[35]
a. Extent of the Comments
As the district court observed, “the prosecutor’s remarks on Gongora’s failure *279 to testify were numerous and blatant.”[36] Rather than a single question or incidental statement, the prosecutor made a series of at least five comments referring to Gongora’s silence as he argued to the jury that Gongora was the shooter. In the guise of clearing up what his earlier comments meant, the prosecutor continued to make comments relating back to the fact that Gongora had not testified. The judge repeatedly cautioned the prosecutor, yet the prosecutor further highlighted the reference by persisting in his train of “who you would expect to hear from” argument. This factor weighs against a finding that the error was harmless.
b. Inference of Guilt Stressed to the Jury
The prosecutor’s initial comment clearly and strenuously — regardless of whether the comments were intentional or inartful — emphasized Gongora’s guilt to the jury based on his failure to testify:
You listen to people inside there. Who else would you want to hear from, though? The shooter? We’re not going to talk to that person.... This person right here—
[Pointing to Gongora’s name on a chart.] Nelson Gongora, the shooter. That’s the person on trial. That’s the person who deserves to be found guilty of capital murder. Who should we go ahead and talk to? Who should we go ahead and present to you? Should we talk to the shooter? Should we talk to—
A principal focus of the prosecutor’s closing argument, and central to the State’s case, was the credibility of co-conspirators’ statements that Gongora was the shooter. It appears as though the prosecutor attempted to bolster the credibility of those statements by repeatedly stressing the fact that some co-conspirators took the stand, while persistently questioning Gongora’s claim of not-guilty by reference to his refusal to take the stand. The argument went to the core of the State’s case and aggressively prompted the jury to infer guilt based on Gongora’s failure to testify. Further, the comments came at the very end of the prosecution’s closing arguments.
Examined in context, the prosecution’s subsequent comments on Gongora’s silence might be read, as the State and the dissent contend, as a product of a prosecutor tripping over his words as he inartfully attempted to correct his initial mistake. But their effect, coming as they did after the prosecutor’s initial statement stressing an inference of guilt, was to reinforce the impression of Gongora’s guilt from his failure to testify. It also matters not that the prosecutor’s later comment merely recited that Gongora “has a Fifth Amendment right not to testify.” As we have previously observed, a reference of this sort by the prosecutor “is far different” than a cautionary instruction about a defendant’s Fifth Amendment right not to testify given by the court.[37] Even as the prosecutor noted Gongora’s Fifth Amendment right, the function of the prosecutor’s comment was to “focus[ ] the jury’s attention on the fact that the defendants did not testify.”[38] While telling the jury of Gongora’s right, he commented on its exercise. This translated into a clear message: Gongora’s right not to testify is not a right to be free of the jury weighing the exercise of that right against him.
This factor, too, thus weighs against a finding of harmless error. The Fifth *280 Amendment violation here did not consist of an “isolated comment,” and whatever the prosecutor’s subjective intent, his manifest purpose was to “strike at the jugular of the defense.”[39]
c. Curative and Cautionary Instructions
While the trial court issued general cautionary instructions about the defendant’s constitutional right not to testify at voir dire and again immediately before closing argument,[40] the prosecutor’s comments followed those instructions. Moreover, although two of the prosecutor’s improper remarks were promptly followed by sustained objections and curative instructions, those instructions — telling the jury to “disregard” the comment — were perfunctory and devoid of specificity. Finally, the trial court did not sustain all of Gongora’s objections to the improper remarks. Specifically, the court overruled Gongora’s objection to the last of the improper comments, in which the prosecutor stated, “I’ll make it very clear. I’m not talking about, do you want to hear from him, because you can’t do that.” While as a general rule, juries are presumed to follow instructions given by the court,[41] neither this court nor the Supreme Court has ever held that the mere fact that a curative or cautionary instruction was offered establishes harmlessness under Brecht,[42] Indeed, the Supreme Court has noted that “[tjhere are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.”[43] Here, the efficacy of the trial court’s initial cautionary instructions was diminished by the lack of a strong admonishment following the statements, the fact that the cautionary instruction preceded the problematic statements, the court’s overruling of Gongora’s objection to the prosecutor’s final remark on his silence, and the mixed message resulting from allowing the jury to consider the comments in some respects.
d. Evidence Supporting Acquittal or Conviction
We also consider the evidence of guilt and innocence presented at trial. The *281 prosecution maintained throughout that Gongora and Orosco had approached Sierra and that Gongora was the shooter. This theory relied on the trial testimony of two of Gongora’s co-conspirators, Juan Vargas and James Luedtke, both of whom had credibility issues. The evidence of guilt in this case was not overwhelming, and there was substantial evidence supporting acquittal.
First, the jury had reason to question Vargas’s and Luedtke’s testimony that Gongora was the shooter. According to Vargas’s initial, written and sworn confession (prior to any plea agreement), Carlos Almanza and James Luedtke approached Sierra and Almanza was the shooter. The statement of Vargas’s wife, given to a detective, was consistent with the facts in that first confession. It was only after Vargas was re-interviewed by Detective Ortega (when he was seeking a plea bargain) that Vargas orally contradicted his initial written statement to claim that Gon-gora and Orosco exited the van to approach Sierra.
Dylan Griffith, with whom Luedtke had lived at the time of the offense, testified that when he met up with Luedtke and the others in Vargas’s van after the shooting, Albert Orosco had a .38 in his waistband and was bragging about having killed a man, saying he took “his dreams” (the words that .Luedtke attributed to Gongo-ra). In addition, Griffith testified that Luedtke had originally asked Griffith whether he should tell police that Orosco did it, and when Griffith said Luedtke should tell the truth about whatever happened, Luedtke said he was not “going down” for it.
Moreover, while Vargas replaced Alman-za and Luedtke with Gongora and Orosco in his second statement to police, he did not indicate in that statement that he had actually seen Gongora shoot Sierra. Indeed, it would have been difficult for Vargas or Luedtke to have actually seen the shooting, given their positions in the van and the van’s location at the time. In addition, the diagram drawn by one of the detectives based on his interview of Vargas shows that Gongora — according to Vargas — would have been walking on the right of Sierra. Luedtke, too, placed Gongora on the right. But Sonia Ramos, the State’s lead-off witness and the only independent eyewitness in the case, stated that the man walking on the left of Sierra shot him; her testimony was consistent with forensic evidence that showed a bullet had hit the back, left side of Sierra’s head. Vargas’s second statement to police had put Orosco on the left. The State offered no explanation of this significant difficulty, which was created by its own witnesses on direct examination.
Second, even taking into account the alternative theory offered to the jury— that Orosco and Gongora entered into a conspiracy to rob Sierra and that Orosco shot Sierra in furtherance of that conspiracy — the evidence against Gongora was far from overwhelming, for at least two reasons. First, the alternative theory not only required the jury to find that Gongora and Orosco entered into a conspiracy to rob Sierra and that Orosco shot Sierra in furtherance of the conspiracy, but also that the shooting “should have been anticipated” by Gongora. Yet the State presented no direct evidence that Gongora should have anticipated a shooting of Sierra by Orosco and made no effort to argue that point in its closing arguments.[44] Second, *282 there was evidence indicating that neither Gongora nor Orosco shot Sierra. Ramiro Enriquez, who had no stake in the case, testified that he was a friend of Almanza in prison and that Almanza had said he did the shooting. That testimony largely aligned with Vargas’s original sworn statement in which he had said that Almanza and Luedtke had approached Sierra and that Almanza was the shooter. The tension between Vargas’s testimony that he saw Gongora shoot Sierra and Vargas’s indication that Gongora was on Sierra’s right not only cast doubt on Vargas’s claim that Gongora was the shooter, but also more generally on the credibility of Vargas’s revised account of what occurred. Gongora’s written statement provided to detectives asserted that he was not the shooter; it made no mention of Orosco; and, contrary to the CCA’s summary of the evidence, it did not indicate that Gon-gora approached Sierra.
Finally, the notes sent out by the jury during deliberations suggest that the prosecutor’s comments reflected a focus on which of the PLM members in the van had testified and which had not. One note requested Vargas’s first statement to the detectives and another asked about Vargas’s response to a question from defense counsel about which people were outside the van,[45] hinting that the jury questioned the credibility of Vargas’s testimony.
In sum, the Fifth Amendment violation in this case was not “an isolated comment in a sea of evidence.”[46] The violation consisted of repeated comments that began after the court issued its cau *283 tionary instruction and continued following each of the court’s brief curative instructions. The physical evidence and the statement of the only non-biased eyewitness did not support the co-conspirators’ testimony that Gongora was the shooter. The evidence that Gongora at least approached Sierra with Orosco to attempt a robbery was somewhat stronger. However, contrary to the state’s contention during closing arguments, the evidence was not “undisputed” that Gongora was guilty as a co-conspirator, in particular given that the State’s main witness had originally identified two others as the people who had approached and killed Sierra — one of whom bragged about the killing to Ramiro Enriquez, an uninvolved party. Indeed, the jury seemed particularly concerned about Vargas’s shifting statements as to who had approached Sierra. Ultimately, “when a court is ‘in virtual equipoise as to the harmlessness of the error’ under the Brecht standard, the court should ‘treat the error ... as if it affected the verdict.’ ”[47] Because the record here leaves us “in grave doubt as to the harmlessness of [the] error,” Gongora is entitled to relief.[48]
V.
Because Gongora was denied a right to a fair trial by the prosecutor’s comments in violation of his Fifth Amendment right not to testify, we REVERSE the judgment of the district court, GRANT Gongora’s petition for habeas relief, and vacate his conviction. Gongora will be released from custody unless within six months of the mandate of this court he is again brought to trial or the case is otherwise terminated by plea or other disposition under state law.

. 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

. Gongora v. Quarterman, No. 07-70031, 2008 WL 4656992, at *1 (5th Cir. Oct. 22, 2008) (Gongora IV).

. In his previous sworn written statement, Enriquez said was not sure how many people, according to Almanza, got out of the van and crossed the street toward Sierra. However, on cross-examination at trial, the prosecutor elicited that Enriquez had told the prosecutor at some point that it was Carlos and two others. Although the prosecutor phrased a series of questions that made reference to a group of three as about what Enriquez had previously told him Carlos said, he then followed up with a question: "And this is what you swear Carlos told you?" To which Enri-quez responded, “Yes.” On re-direct, the defense elicited that Enriquez actually still was not sure about the number of people Carlos had indicated approached Sierra.

. Gongora v. State, No. AP-74,636, 2006 WL 234987 (Tex.Crim.App.2006), cert. denied, 549 U.S. 860, 127 S.Ct. 142, 166 L.Ed.2d 104 (2006) (Gongora I).

. See Ex parte Gongora, No. WR-60,115-02, 2006 WL 3308713 (Tex.Crim.App. Nov. 15, 2006) (Gongora II).

. Gongora v. Quarterman, 498 F.Supp.2d 919, 931 (N.D.Tex.2007) (Gongora III).

. 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

. 28 U.S.C. § 2254(d)(1), (2).

. Thaler v. Haynes, 559 U.S. 43, 130 S.Ct. 1171, 1173, 175 L.Ed.2d 1003 (2010).

. Brown v. Payton, 544 U.S. 133, 141, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005) (citing Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). In contrast, a state court decision is "contrary” to clearly established Court precedent if “it applies a rule that contradicts the governing law set forth in [the Court’s] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result.” Id.

. Renico v. Lett, 559 U.S. 766, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (quoting Williams, 529 U.S. at 410, 120 S.Ct. 1495).

. Id. (quoting Williams, 529 U.S. at 411, 120 S.Ct. 1495).

. Harrington v. Richter, - U.S. -, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)).

. Nelson v. Quarterman, 472 F.3d 287, 293 (5th Cir.2006) (en banc).

. 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

. United States v. Robinson, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988).

. Id. at 34, 108 S.Ct. 864.

. Chapman v. California, 386 U.S. 18, 23-25, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

. Id. at 24, 87 S.Ct. 824; Fry v. Pliler, 551 U.S. 112, 116, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007).

. See Richter, 131 S.Ct. at 786.

. See Fry, 551 U.S. at 120, 127 S.Ct. 2321.

. 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

. Id. at 631, 113 S.Ct. 1710. In this circuit, the assessment of harmless error under Brecht is a mixed question of fact and law, and we thus review the district court's determination de novo. See, e.g., Garcia v. Quarterman, 454 F.3d 441, 444 (5th Cir.2006).

. Fry, 551 U.S. at 121-22, 127 S.Ct 2321. The Supreme Court has explained: "[I]t is implausible that, without saying so, AEDPA replaced the Brecht standard of 'actual prejudice’ ... with the more liberal AED'PA/Chap-man standard which requires only that the state court’s harmless-beyond-a-reasonable-doubt determination be unreasonable.” Id. at 119-20, 127 S.Ct. 2321 (citation omitted) (internal quotation marks omitted).

. Gongora I, 2006 WL 234987, at *10.

. Id.

. Gongora III, 498 F.Supp.2d at 926.

. Id. at 927.

. Jackson v. Johnson, 194 F.3d 641, 652 (5th Cir.1999) (citation omitted).

. See 28 U.S.C. § 2254(d)(1).

. Brecht, 507 U.S. at 638, 113 S.Ct. 1710; see also United States v. Pierre, 958 F.2d 1304, 1312 (5th Cir.1992) (en banc) ("To determine the potential prejudicial effect of the statements, we must consider the context in which the prosecutor made them.").

. O’Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). The Court has "deliberately phrasefd] the issue in terms of a judge’s grave doubt, instead of in terms of 'burden of proof.' " Id.

. Anderson v. Nelson, 390 U.S. 523, 523-24, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968); see also United States v. Johnston, 111 F.3d 380, 398 (5th Cir.1997) (considering "the magnitude of the prejudicial effect of the remark" and "the strength of the evidence of the defendant’s guilt”).

. See Johnston, 111 F.3d at 398 (listing "the efficacy of any cautionary instruction” as a factor to consider in assessing the harmlessness of a prosecutor’s improper comments); see also Greer v. Miller, 483 U.S. 756, 767 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (finding "no reason to believe that the jury in [the] case was incapable of obeying ... curative instructions” given after the introduction of inadmissible evidence).

. Where, as here, the state appellate court made no finding under Chapman, the Supreme Court has suggested that it "makes no sense to require formal application of both tests (NEDPA/Chapman and Brecht) when the latter obviously subsumes the former.” Fry, 551 U.S. at 120, 127 S.Ct. 2321. We note, though, that as our Brecht analysis implies, the CCA could not have reasonably deter *279 mined that the error in this case was harmless beyond a reasonable doubt.

.Gongora III, 498 F.Supp.2d at 926.

. Johnston, 127 F.3d at 398.

. Id.

. United States v. Griffith, 118 F.3d 318, 325 (5th Cir.1997) (internal quotation marks omitted) (finding that a Gnffin violation did not affect the defendant's substantial rights where “it was an isolated comment, which did not 'strike at the jugular' of the defense, and which the jury was immediately instructed to disregard” and the "spontaneous remark [was] intended to call attention to [the defendant's] disruptive behavior during [the prosecutor’s] argument, and not to imply that he was harboring guilty secrets”).

. The court's instruction prior to closing argument read as follows:
In a criminal case the law permits the Defendant to testify in his own behalf but he is not compelled to do so, and the same law provides that the fact that a defendant does not testify shall not be considered as a circumstance against him. You will, therefore, not consider the fact that the Defendant did not testify as a circumstance against him; and you will not during your deliberations allude to, comment on, or in any manner refer to the fact that the Defendant has not testified.

. See Zafiro v. United States, 506 U.S. 534, 540-41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

. See, e.g., Johnston, 127 F.3d at 398.

. Richardson v. Marsh, 481 U.S. 200, 207, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (quoting Bruton v. United States, 391 U.S. 123, 135-36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)) (internal quotation marks omitted); see also Donnelly v. DeChristoforo, 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (acknowledging that "some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect”).

. The dissent insists that "the evidence is overwhelming that, at the veiy last, Gongora was guilty as a party to capital murder,” pointing to Gongora’s written statement, in which Gongora admitted that he and others exited the van to "get a little money [from *282 Sierra] and go about our business.” But in its focus on the evidence of Gongora’s participation in the conspiracy to rob Sierra, the dissent overlooks the fact that the jury could not convict Gongora unless it also determined that Gongora "should have ... anticipated” that Sierra's murder would result from carrying out the conspiracy.

. Specifically, Jury Note # 3 stated: "We need the original statement of Juan Vargas of April 27th and his court testimony.” The trial court responded that Vargas's original statement to police was not evidence. Jury Note # 5 stated: "On Juan Vargas Statement on Mon March 24th I would like to know when the defense ask[ed] ‘who was outside the van' he mention 2 people who were outside the van, what were the names he said.” The court responded: "If you wish to receive the testimony, it will be necessary for you to certify that you are in dispute as to a specific statement pf the witness, and you should request that part of the witness' statement on the specific point in dispute, and only on that point which is in dispute.” The jury then appears to have revised the original note, crossing out "mention” and replacing it with "stated,” crossing out "who” (in the phrase "who were outside the van”), crossing out "said” and replacing it with "stated,” and adding: "Three jurors could not hear the response of Juan Vargas.” The court then responded: "The specific question you requested was not asked. Please specify whether you are asking about a specific question or a general topic on that issue. If you wish to receive the testimony, it will be necessary for you to certify that you are in dispute as to a specific statement of the witness, and you should request that part of the witness' statement on the specific point in dispute, and only on that point which is in dispute.” The jury did not resubmit the request. The only other jury note requesting evidence or testimony was Jury Note # 1. That note requested “all evidentiary exhibits, except the bullets,” "photos of any who testified that were in the van,” and "the easel with all exhibits.”

. Cotton v. Cockrell, 343 F.3d 746, 752 (5th Cir.2003) (citation omitted) (internal quotation marks omitted) (finding that a comment by the prosecutor was harmless where two non-interested witnesses identified the defendant as the attacker and the defendant had admitted to an acquaintance that he had "killed a D.A.”); see also Nethery v. Collins, 993 F.2d 1154, 1159 (5th Cir.1993) (finding that a prosecutor’s improper comment did not have a substantial and injurious effect in light of the "overwhelming evidence of guilt").

. Fry, 551 U.S. at 121 n. 3, 127 S.Ct. 2321 (quoting O’Neal, 513 U.S. at 435, 115 S.Ct. 992).

. O’Neal, 513 U.S. at 437, 115 S.Ct. 992.