# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 13, 2013

Lyle W. Cayce
Clerk

No. 07-70031

NELSON GONGORA,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas

ON PETITION FOR REHEARING EN BANC

Before HIGGINBOTHAM, STEWART, and OWEN, Circuit Judges.
PER CURIAM:

The court having been polled at the request of one of the members of the court and a majority of the judges who are in regular active service and not disqualified not having voted in favor (FED. R. APP. P. and 5TH CIR. R. 35), the Petition for Rehearing En Banc is DENIED.

Voting for en banc rehearing were: Judge E. Grady Jolly, Judge Edith H. Jones, Judge Jerry E. Smith, Judge Edith B. Clement, Judge Priscilla R. Owen, and Judge Jennifer W. Elrod. Voting against en banc rehearing were: Chief Judge Carl E. Stewart, Judge Carolyn D. King, Judge W. Eugene Davis, Judge

James L. Dennis, Judge Edward C. Prado, Judge Leslie H. Southwick, Judge Catharina Haynes, Judge James E. Graves, and Judge Stephen A. Higginson.

Upon the filing of this order, the clerk shall issue the mandate forthwith. See FED. R. APP. P. 41(b).


ENTERED FOR THE COURT:

_____

PATRICK E. HIGGINBOTHAM
UNITED STATES CIRCUIT JUDGE

PATRICK E. HIGGINBOTHAM, Circuit Judge, respecting the denial of rehearing en banc:

I write here to explain my reasons for opposing en banc rehearing. The relevant legal principles in this case are settled and challenged only in their application. That this is a capital case sounds no greater call for studied and evenhanded application than ought always be at hand. At the same time and as I will insist, the binary choice of life or death tolerates no mediating, graduating scale of consequences for slippage in protecting rights constitutionally secured to persons whose life the State would take. Ours was no watery eyed decision. When a prosecutor with a close case repeatedly asks the jury to do what it must not — infer the accused's guilt from his insistence that the state prove its case without his testimony — the conviction cannot stand.

I.

Facts matter — at every level. And the events at trial must be mastered to give to grandly stated constitutional norms their content, meaning, and force. To these eyes, the undisputed record of what occurred at this trial permits no answer in service of the constitutional principle at issue but the one we gave. The question is not whether the jury could have convicted Gongora of capital murder absent the error; rather, it is whether the admissible evidence of Gongora's guilt presented the State with a difficult case, and whether the comments on silence closed the evidentiary gap. The prosecutor persisted in asking the jury to infer Gongora's guilt from his not taking the stand. Such a blatant violation of a primer rule of criminal trials by a felony prosecutor from a major metropolitan city is no accident. It is in the heat of trial with close cases that able counsel sometimes give way to the frustration of being denied an opportunity to shore their case. Viewed objectively, the effort was to enhance the opportunity for conviction. Whatever other post hoc speculation may be

offered, it cannot erase the record — of the arguments made and the evidence presented of Gongora's participation in the robbery and death of Delfino Sierra.

The responsive path of the law here reflects the power of prosecutorial comment. Our jurisprudence long tolerated comment on a defendant's silence, persuaded that the Fifth Amendment was adopted only to forbid a defendant's coerced testimony. But the very force of these prosecutorial comments came to be viewed in pragmatic terms as being coercive in fact, not to be turned by anemic, routinized instructions to disregard. Alluding to this history here is only to remind that the effectiveness of such comments has not changed — and that their temptation for a prosecutor with a less-than-compelling case remains great. So an effort to save a verdict tainted by such violations with contentions that the State's case was overwhelming at least demands close scrutiny of the facts. I resolve no facts. I only recount the versions competing for the jury's verdict, leaving them to reject with their own voice the view that there were none that offered succor to the defendant. There were, and I will describe them.

## II.

The State's theory was that six men in a van spotted Delfino Sierra walking on Northside Drive in Fort Worth, Texas, that two of the men approached Delfino Sierra, that one was the shooter, and that the other was the accomplice. After sorting and re-sorting this deck of six, the State rested its capital case against Gongora upon its ability to persuade the jury that he was one of those two men — specifically, the shooter. Gongora admitted, in a pre-indictment statement to police investigators introduced into evidence at trial, that he was in the van when the men spotted Sierra walking and that "we wanted to . . . get a little money." He did not admit that he was one of the two men who approached Sierra. Rather, his account of events, accepted as true and understood together with Juan Vargas's initial sworn statement to police, can

lead to no other conclusion than that Gongora remained in the van after Vargas, the van driver, dropped off the shooter and his accomplice in a parking lot across the street and to the east of the intersection where Sierra was shot.[1]

Gongora recounted that "we passed [Sierra on Northside Drive] . . . and pulled into the little store before you pass the railroad tracks," that "we did a U-turn in the parking lot and went back towards where [Sierra] was walking," that "next thing I remember the side door opened, all of us were going to get out then there were gunshots," that "I turned around and saw the guy that was wearing the cowboy hat laying on the ground," and that "[r]ight after the shots all of us jumped back in the van and we left."[2] For his part, Vargas — an indicted co-conspirator who testified under plea as the State's star witness — insisted in his initial, pre-plea statement that he stopped at the "little store" on Northside Drive before the railroad tracks; that Carlos Almanza (the shooter) and James Luedtke (the accomplice) jumped out in the store's parking lot and

---

[1] To assist the reader, I attach in an appendix my own diagrams of Vargas's two competing accounts of the crime, drawn from the undisputed testimony and Defense Exhibit 15 (introduced into evidence at trial without objection by the prosecution).

[2] Gongora's full statement, which was taken by police detective Carlos A. Ortega on the morning of June 19, 2001, read:

Me, Carlos, Albert, and Little Wero got in Juan's van and we all took off to my house. We came up 28th and then took a right to 25th and headed to Main St. Then we went down Main St. and turned on Northside Dr. When we made the turn we saw this guy walking by himself on the right side of the street if you are going towards I-35. I'm not sure what he was wearing but I remember he was wearing a cowboy hat. We passed him up and pulled into the little store before you pass the railroad tracks. We did a U-turn in the parking lot and went back towards where the guy was walking. All we wanted to do is get a little money and go about our business. Next thing I remember the side door opened, all of us were going to get out then there were gunshots, I turned around and saw the guy that was wearing the cowboy hat laying on the ground. I think there was about three fast shots fired. Right after the shots all of us jumped back in the van and we left. . . . Q. This deal here was this suppose [sic] to go down the way it did? A. No, we were just suppose [sic] to get some money and don't do anything stupid. Q. Who got down with the gun? A. I don't know.

(Emphasis added.)

crossed Northside Drive on foot toward Sierra; and that Vargas did a U-turn in the parking lot, drove back toward Sierra, and stopped in a driveway on Calhoun Street.[3] The only part of Vargas's story that changed at trial was the identity of the two men who jumped out of the van and walked across the street — this, after extensive plea negotiations between Vargas, his lawyer, and both prosecutors. The prosecution presented Vargas's trial version of the respective routes of the van and its six passengers as undisputed fact — a characterization that is accurate, except for the identity of the two assailants. The store, the driveway, and Vargas's route are all clearly depicted in Defense Exhibit 15, an oversized map of the crime scene drawn by a detective in open court based on the Vargas accounts and the account of the only neutral eyewitness, Sonia Ramos. The exhibit was admitted into evidence without objection by the prosecution.[4]

---

[3] Though Vargas's initial statement to police was introduced for the record only, Vargas clearly and repeatedly testified at trial that the shooter and his accomplice got out in the parking lot and crossed the street on foot. See 37 RR 106–109, 124–125. Moreover, the jury heard — from Vargas, the police detective, and the prosecution itself — that the only aspect of Vargas's story that changed was the identity of the two men who jumped out in the parking lot and assailed Sierra. See, e.g., 37 RR 135–137; 38 RR 151–52. The record reflects that this characterization of Vargas's initial statement is accurate.

[4] The record is replete with examples of the prosecution's reliance on Vargas's account as set forth in Defense Exhibit 15, but I ought provide at least one example:

> [Prosecutor:] Now, the rest of the chart, though — the rest of this chart — the details never changed, did they, from [Vargas's] first statement and second statement, correct?
> [Detective:] Correct.
> [Prosecutor:] All of this, the passing the victim, pulling into the gas station, doing a U-turn and, ultimately, picking up the shooters, that all remained exactly the same, right?
> [Detective:] Correct.
> [Prosecutor:] The only difference was the identity of the people who got out to do the robbing, right?
> [Detective:] Correct.
> [Defense:] Could you identify which chart you've just —
> [Prosecutor:] Yeah. I'm talking about Defendant's Exhibit 15.

38 RR 151–52.

Putting Gongora's account together with Vargas's initial statement and accepting both as true, Gongora must have remained in the van after Vargas dropped off Almanza and Luedtke in the parking lot and until the van arrived in the driveway on Calhoun Street south-east of Sierra and his two assailants. In this version of events, Gongora's statement that "all of us were going to get out then there were gunshots" refers to Gongora and the remaining three men in the van. Indeed, the apparent absence of any time gap between the moment when Gongora was "going to get out" of the van and the "gunshots" not only maps perfectly onto Vargas's testimony that he heard the shots shortly after he pulled into the driveway, but makes sense only if the shooter and the accomplice, who had to walk for some distance to cross the street and intercept Sierra (and whom Ramos spotted walking with Sierra for some time) were already long since out of the van. And the fact that Gongora had to "turn[] around" to see "[Sierra] laying on the ground" is consistent with the location of the van at the time of the shooting (in the driveway) as well as Vargas's testimony that he could see the shooting from the van. Finally, both of Vargas's accounts had the shooter jumping out of the front passenger seat, whereas Gongora noted only that "the side door opened." It bears reminding that Gongora gave his statement without the benefit of counsel — before the criminal complaint was filed and the grand jury returned an indictment.

At best, Gongora admits that he briefly exited the van after Vargas looped the van back toward Sierra and temporarily stalled out his engine in the driveway on Calhoun Street. Gongora stated that "all of us were going to get out then there were gunshots" and that "I turned around and saw the guy that was wearing the cowboy hat laying on the ground." By this language, Gongora was still in the van or about to get out when he heard the gunshots. With that in mind, the jury could have reasonably concluded that Gongora's statement that "all of us jumped back in the van" refers to the fact that the two men who

accosted Sierra got back into the van (i.e., "everyone was back inside"). This point was not lost on the defense, which reminded the jury that "if you read the statement, he never got out of the van . . . that's one version you can take from this." Or, Gongora could have been referring to himself and the remaining passengers — after all, in Vargas's accounts, the shooter and accomplice did not reenter the van until it pulled back out of the driveway onto Calhoun Street.[5] What is certain is that Gongora did not, as suggested by the CCA, admit that he was one of the two men who approached Sierra — an admission that would have directly contradicted his insistence that he did not know "who got down with the gun."[6] And the jury heard sharply diverging accounts of the identity of the shooter and his accomplice — two from Vargas, the State's key witness.

In Vargas's initial sworn statement to police, Carlos Almanza and James Luedtke ("Guero"/"Wero") jumped out of the van in the parking lot and walked across the street toward Sierra. Almanza was the shooter, and the other three men in the van were left unmentioned. This account was corroborated by Vargas's wife as well as by Almanza's former cell mate Ramiro Enriquez, who had no stake in the case and testified that Almanza admitted to the killing in prison.[7] According to Enriquez, Almanza gave an account in which Vargas

---

[5] That Gongora was the "only" person in the van to give an account that suggested that more than two people got out of the van at some point does not travel against the narrative line that I am lifting from the record. It would not have been lost on the jury that Vargas and Luedtke had an incentive to downplay their own level of participation in the crime: admitting any overt act in furtherance of the robbery could serve to inculpate them as parties. And the remaining men in the van — Orosco, Almanza, and Steven Gongora — all refused to testify.

[6] This is no appellate finding, but a recitation by the CCA of what the jury might have concluded, viewing the evidence in the light most favorable to the prosecution.

[7] The corroboration by Vargas's wife requires some explanation. As the CCA observed on direct review:

[Vargas's wife Maria] Morales [gave a sworn statement to police] that on a night around the time of the offense, Vargas came home crying. Although he would not initially tell her the reason, Vargas eventually explained that he and some

(continued...)

parked his van across the street from Sierra and Almanza got out of the van "with some of his homeboys (I'm not sure how many)," crossed the street toward Sierra, said "what's up" in Spanish, shot Sierra in the back of his head, stood over his body, and, finally, got picked up by Vargas — an account that closely resembles Sonia Ramos's eyewitness account, Vargas's initial statement, and Luedtke's trial testimony.[8] The prosecution's ballistics expert could not rule out the possibility that the bullets recovered from Sierra's body came from the same gun that Almanza used in a second, non-fatal shooting later that night.

The State's case against Gongora did not exist until Vargas, the driver, made one critical change to his story, substituting Gongora for Almanza and Albert Orosco for Luedtke as the two men who walked across the street.[9] That was Vargas's proffer to the prosecution, conditioned, as the jury was well aware, on his receipt of a 23-year sentence instead of a trial for capital murder. With

---

[7] (...continued)
others had been in the van when they saw a man (apparently referring to Sierra) that [Carlos] Almanza claimed owed him money. When they stopped the van, Almanza killed the man for no reason.
Gongora v. State, 2006 WL 234987, at *4 (Tex. Crim. App. 2006). However, Gongora's jury only heard a police detective testify that Morales's statement was "consistent with" Vargas's initial account, that the detective had "interviewed her independently," that he "didn't interject anything as to who I had spoken to or anything else like that," and that he "allowed her to tell me what she knew and without any other guidance or pushing or anything like that." The trial court refused to allow Gongora to introduce Morales's full statement or cross-examine her. Gongora raised the issue on direct appeal, but the CCA flatly concluded that "even if the trial court abused its discretion . . . , [Gongora] was not harmed by this error." Id. Three judges dissented, concluding that the error warranted a new trial. See id. at *15. Gongora did not raise the issue before our panel.

[8] Of course, Luedtke testified that Gongora, not Almanza, was the shooter who spoke to Sierra and stood over his dead body — but only after Vargas cut Luedtke loose with the plea agreement, substituting Gongora for Almanza and Orosco for Luedtke.

[9] Gongora's trial counsel made sure that this point was not lost on the jury. See, e.g., 40 RR 69–70 ("I do want you to notice one thing about the State's presentation. It hinges on Juan Vargas. . . . Did he tell a police officer the truth the first time he came in contact? . . . That's when he said that Carlos [Almanza] and Guero [(James Luedtke)] did this. Carlos did the shooting. Doesn't have a lawyer then. It's just him and the cops. . . . And now, no, it's not Carlos and Guero. No. It's got to be Albert [Orosco] and my client.").

9

this exculpation, Luedtke, of course, followed with the same account, clearing himself from the risk of capital charges and giving the State a second witness.[10] Even as he took the stand, however, Luedtke gave testimony consistent with his initial role as the accomplice, offering minute details about the shooting and stating that he heard the shooter utter specific words to Sierra ("casa la febio")[11] when the jury could have very reasonably concluded, based on common sense and Vargas's testimony that the shots rang out immediately after he pulled into the driveway, that only the shooter and the accomplice would have been able to hear what passed between themselves and Sierra.[12]

Sonia Ramos, the sole independent eyewitness, testified only that she spotted two men walking with Sierra about a block ahead of her as she was driving west on Northside Drive and that the man walking to Sierra's left shot him in the intersection of Northside and Calhoun. Ramos testified that she did

---

[10]  The prosecution did not deliver a coherent narrative of why Vargas initially inculpated Luedtke while "covering" for Albert Orosco. Luedtke was a card-carrying member of the Puero Li'l Mafia, of which Vargas was a leader, while Orosco had no affiliation with the gang. Police did not talk to Luedtke until six months before Gongora's trial — over a year after the shooting. Dylan Griffith, another PLM member not involved in Sierra's shooting, testified at trial that Luedtke told him "I ain't — I ain't going down for it. I'll put it on whoever I got to, as long as I don't go down for it."

[11] Luedtke testified that "casa la febio" means "give me your money" in Spanish. On cross, he acknowledged that he wasn't sure what the words meant. He insisted, however, that he heard the shooter utter those specific words.

[12]  The defense was well aware of the problems with Luedtke's testimony and highlighted them to the jury during closing arguments:

> Guero [(Luedtke)] . . . says they were so close he could hear something that was being said. It's interesting Juan Vargas didn't hear it. He never said it. Not once. In fact, he said he couldn't hear anything . . . If he heard those words, then he was three or four or five feet away from Delfino Sierra, which makes him one of the culprits, which makes Juan Vargas'[s] first declaration that he gave to the detective correct. . . . And I want you to think about it when you go back there, because there's no way he could have heard anything from his position in that — in that van.

40 RR 76, 86–67. The jury also learned that Vargas's initial account implied that he did not see which of the two assailants (at that point, Almanza and Luedtke) did the shooting.

not even notice the van until she glanced over her shoulder while turning right on the opposite corner of the next cross-street past the intersection, a block away ("I looked back, I seen the van, and then I took off"). Ramos twice stated that she did not see who got back into the van, nor did she indicate whether she was in a position to see anyone around the van. She noticed the van because its reverse lights were on,[13] suggesting that Vargas and the three passengers were already backing out into Calhoun Street (where, according to Vargas, they intercepted the shooter and the accomplice). As the State conceded during its closing argument, Ramos's placement of the shooter to Sierra's left ran headlong into Vargas's revised account, casting doubt not only on Gongora's role as the shooter, but on Vargas's revised account more generally.[14]

This was the posture of the State's case-in-chief when the prosecutor repeatedly reminded the jury, in the face of sustained objections and in a closing rebuttal that could not be answered by the defense, that Gongora — unlike, say, James Luedtke — failed to testify to explain his "role" in Sierra's robbery and shooting. That the prosecutor unrelentingly pounded on Gongora's silence —

---

[13] The shooting occurred between 9:30PM and 10:00PM in April. Ramos testified that she was able to see Sierra and his two assailants walking because the street was well lit. She also testified that there was some oncoming traffic.

[14] Ramos testified that she first spotted Sierra flanked by two men about a block ahead of her, with all three men walking west on Northside Drive (in her driving direction). Ramos insisted that the shooter walked to the left of Sierra; that the other man walked to Sierra's right; and that none of the men changed their relative positions before the shooting. There was no confusion as to what Ramos meant by "left" and "right," as she repeatedly testified that the three men were walking on the left side of the street (recall that Ramos and the men were moving in the same direction, so that her left was their left). Moreover, her testimony was consistent with forensic evidence that a bullet hit the back, left side of Sierra's head. Vargas, however, placed Gongora to Sierra's right, again relative to Sierra's walking direction. And though the detective's intake sketch of the crime scene (not in evidence) does not clearly reflect Vargas's placement of Gongora and Orosco, the panel's focus was on the defense's unobjected-to Exhibit 15. The exhibit, a map, clearly placed Gongora to Sierra's right and Orosco to Sierra's left; moreover, the detective who drew it insisted that it reflected Vargas's account of the men's respective positions — in the teeth of sharp questioning by the prosecution.

first directly and later by implication — cannot seriously be disputed.[15]  And understood in the context of the narratives competing for the jury's verdict, the effect of these comments was deadly.  After all, "[w]ho do you expect to hear from?  The person who wasn't involved at all, that had nothing at all, just present during that deal?  Of course you hear from that person."  (Left unstated was the reality that those who did testify were heard from only after their exculpation through the plea deal struck with Vargas.)

It is no answer that there was sufficient evidence to convict Gongora as a party to capital murder even if he remained in the van after the shooter and the accomplice jumped out and headed toward Sierra.[16]  Brecht focuses not on the sufficiency of the evidence sustaining the conviction, but on actual prejudice to the jury's verdict.[17]  Here, the prosecution itself repeatedly emphasized that the six van-inhabitants' respective "roles" in Sierra's robbery and murder were

---

[15]  See Gongora v. Thaler, 710 F.3d 267, 275–80 (5th Cir. 2013); see also id. at 287 (Owen, J., dissenting) ("I agree [with the panel majority] that the [initial] statements . . . were an impermissible comment on Gongora's assertion of his Fifth Amendment rights."); Gongora v. Quarterman, 498 F. Supp. 2d 919, 929 (N.D. Tex. 2007) ("Having thoroughly reviewed the prosecutor's remarks, the court concludes that the prosecutor did, in fact, intend to comment on Gongora's silence.  The court further concludes that the character of the remarks were such that the jury would necessarily construe them as comments on Gongora's silence.").  During oral argument, the State conceded that the comments were clearly improper.  And the prosecutor himself characterized his initial comments as a "big mistake."

[16]  Had the State attempted to convict Gongora on the basis of his agreement to the conspiracy and mere presence in the van, it would have had a difficult time explaining its 23-year plea deal with Juan Vargas.  Vargas, the van driver, was arguably nearly as culpable as the accomplice, admitting not only that he joined the conspiracy to rob Sierra, but that he played a critical role in carrying out the robbery, dropping off and picked up the two assailants.  The State's solution was to argue that whereas Vargas was merely "technically" guilty of capital murder under the law of the parties, Gongora was "a stone-cold killer," meaning that "the only sane verdict in this case is guilty as charged."

[17]  O'Neal v. McAnich, 513 U.S. 432, 438 (1995) ("The [Brecht] inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot stand." (quoting Kotteakos v. United States, 328 U.S. 750, 764–65 (1946)).

critical to gauging their culpability. And as reflected in the jury instructions, the State's law-of-the-parties theory was narrow, hinging on the notion that Gongora was either the shooter or the accomplice. The prosecution knew that its case rested on the testimony that it had plea bargained for — and that there was significant evidence in the record to support either of Vargas's diverging accounts. And it perceived, correctly, that reasonable doubts remained. It is in this context that the comments on Gongora's silence took their toll.

I am keenly aware of the Supreme Court's strong enforcement of AEDPA and the principles of federalism in which the Act is grounded — a command anticipated in and subsumed by Brecht.[18] I remain convinced that the prosecutor's unrelenting Fifth Amendment violations here infected every aspect of Gongora's trial; that they had a real, substantial, and injurious effect on the jury's verdict, causing the jury to accept the State's theory that Gongora was either the shooter or the accomplice when the evidence identifying him as such came from the shifting and contradicted testimony of co-conspirators who were high on heroin and drunk at the time of the shooting, questioned their own

---

[18] Fry v. Pliler, 551 U.S. 112, 117–18 (2007) ("In Brecht . . . we considered whether the Chapman standard of review applies on collateral review of a state-court criminal judgment under 28 U.S.C. § 2254. Citing concerns about finality, comity, and federalism, we rejected the Chapman standard in favor of the more forgiving standard of review applied to nonconstitutional errors on direct appeal from federal convictions."); id. at 119–20 ("It is implausible that, without saying so, AEDPA replaced the Brecht standard of 'actual prejudice' with the more liberal AEDPA/Chapman standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable."); see also Burbank v. Cain, 535 F.3d 350, 356–57 (5th Cir. 2008) ("Although the District Court set forth certain provisions of the [AEDPA] as the governing standard of review, it actually applied the standard of review that the Supreme Court set forth in Brecht . . . . Indeed, the Supreme Court recently explained [in Fry] that the Brecht standard subsumes the standards announced in AEDPA."); Ayala v. Wong, 693 F.3d 945, 961 & n.14 (9th Cir. 2012) (same); Wiggins v. Boyette, 635 F.3d 116, 121 (4th Cir. 2011) (same); Wood v. Ercole, 644 F.3d 83, 94 (2d Cir. 2011) (same); Ruelas v. Wolfenbarger, 580 F.3d 403, 412 (6th Cir. 2009) (same); Foxworth v. St. Amand, 570 F.3d 414, 435 (1st Cir. 2009) (same); Bond v. Beard, 539 F.3d 256, 275–76 (3rd Cir. 2008) (same); see also Vining v. Sec'y, Dep't of Corr., 610 F.3d 568, 571 (11th Cir. 2010) (applying only Brecht, citing Fry); Welch v. Workman, 639 F.3d 980, 992–93 (10th Cir. 2010) (same); Jackson v. Norris, 573 F.3d 856, 858 (8th Cir. 2009) (same).

recollection of events, changed their stories prior to trial, and testified under plea or fear of charges. It signifies that during oral argument, counsel for the State conceded that the prosecutor who handled the closing rebuttal may have become "emotional" and may have reached "the point where this guy feels like he's got to say something to establish the credibility of these accomplice witnesses."[19] Even were AEDPA/Chapman to govern our review, declaring the Griffin errors in this case "harmless beyond a reasonable doubt" would drain the right to silence of all meaning. Such a conclusion cannot, by any stretch of language, be characterized as fairminded or reasonable.

I have lifted from the record one narrative that the jury could have drawn. That another, the State's, can be drawn is no answer to the prosecutor's impermissible argument — one born of a fear that the jury would not accept that version of events as true beyond a reasonable doubt. So, I say only that I share this felony prosecutor's doubts — grave doubts that caused him to make what he well knew was an argument that was potent, and forbidden because it is.

---

[19] The jury deliberations suggest that the prosecution had good reason to fear that its reliance on Vargas's testimony would leave reasonable doubt: the jurors requested all exhibits and sent out a number of notes — including several requests for evidence and testimony bearing on Vargas's conflicting accounts of who approached and assailed Sierra.

**Appendix A: Diagram of Vargas's First Account (Not To Scale)**



**Appendix B: Diagram of Vargas's Second Account (Not To Scale)**



JERRY E. SMITH, Circuit Judge, joined by JOLLY, JONES, CLEMENT, and OWEN, Circuit Judges, dissenting from the denial of rehearing en banc:

In disposing of habeas corpus petitions, this court is not permitted to substitute its judgment for that of the state courts.[1]  But that is what this panel majority has done.[2]  Although it pretends to apply the strict standard of Brecht

---

[1]  "Habeas corpus serves as 'a guard against extreme malfunctions in the state criminal justice system, not a substitute for ordinary error correction through appeal.'"  Dorsey v. Stephens, 720 F.3d 309, 314–15 (5th Cir. 2013) (quoting Harrington v. Richter, 131 S. Ct. 770, 786 (2011)).

[2]  In defense of his panel majority opinion, Judge Higginbotham takes the unusual step of filing a spirited statement "respecting the denial of rehearing en banc."  Responding to this dissent, he not only presents his judgment as a substitute for that of the state courts, but he additionally offers his proposed verdict for that of the state-court jury.  Ignoring the double layers of deference with which we review state-court habeas rulings, Judge Higginbotham also announces the following per se rule:  "When a prosecutor with a close case repeatedly asks the jury to do what it must notSSinfer the accused's guilt from his insistence that the stare prove its case without his testimonySSthe conviction cannot stand."  Such an inflexible standard of review would contravene decades of habeas jurisprudence, not to mention caselaw on harmless error.

Although purporting to "resolve no facts," Judge Higginbotham credits some statements, disregards others, and generally approaches the case as would a fact-finder in the first instance—all before addressing the prosecutor's comments on Gongora's failure to testify. (See, for example, Judge Higginbotham's conclusion that Gongora's use of the future tense—"all of us were going to get out then there were gunshots"—definitively indicates that he had not left the van when the shots were fired, then speculating that a simultaneous statement—"all of us jumped back in the van"—does not bear its plain meaning, i.e., that Gongora had left the van.) Once he reaches the prosecutor's scattershot comments, Judge Higginbotham unpersuasively characterizes them an "unrelenting[] pound[ing]."

Almost entirely missing from Judge Higginbotham's thoughtful analysis of the record is precisely what Gongora must show: some meaningful nexus between the error and the verdict.  Judge Higginbotham contends that the prosecutor's comments must have swayed the jury because, before they were made, the state's case was lacking.  But Judge Higginbotham offers no explanation—beyond his ipse dixit—for how the prosecutor's borderline-incoherent statementsSSwhich the jury was swiftly and repeatedly instructed to disregardSS"closed the evidentiary gap."  See Gongora v. Thaler, 710 F.3d 267, 285–87 (5th Cir. 2013) (Owen, J., dissenting) (quoting the prosecutor).

Judge Higginbotham maintains that "reasonable doubts remained" before the prosecutor impermissibly commented on Gongora's silence.  If that is so, however, it is highly

(continued...)

17

v. Abrahamson, 507 U.S. 619 (1993), its gross misapplication of that standard evades the Supreme Court's recent habeas instructions and circumvents the comity and federalism that Brecht was intended to safeguard. See id. at 635–38. This is grave error that infects this circuit's habeas jurisprudence, so I respectfully dissent from the denial of rehearing en banc.

## I.

Gongora "confessed in writing that he intended to rob the victim . . . [and] that he left the van [in which he was riding with five others] to rob the victim." Gongora, 710 F.3d at 289–90 (Owen, J., dissenting). Irrespective of whether Gongora was the shooter, those facts establish his guilt under Texas's law of parties. See id. at 290–91 (Owen, J., dissenting). On direct appeal, Gongora claimed the prosecutor impermissibly commented on his failure to testify. The Texas Court of Criminal Appeals ("TCCA") concluded to the contrary:

> When viewed in context, the complained-of comments appear to be the prosecutor's attempt to comment on [Gongora's] failure to produce witnesses other than [himself], which is a permissible area of comment. . . . Nonetheless, the prosecutor's actual comments tended to be inartful and often confusing, leading the trial judge to sustain [Gongora's] objections to the remarks and to instruct the jury to disregard them. However, the court did not abuse its discretion in thereafter overruling [Gongora's] various motions for mistrial on this issue. On this record, the prosecutor's comments were not so blatant that they rendered the instructions to disregard ineffective. Thus, the judge reasonably concluded that the instructions to disregard effectively removed any prejudice caused by the prosecutor's comments.[3]

---

[2] (...continued)
unlikely that the prosecutor's error did anything to dispel them.

[3] Gongora v. State, 2006 WL 234987, at *10 (Tex. Crim. App. Feb. 1, 2006) (citation omitted), cert. denied, 549 U.S. 860 (2006).

On collateral review, the federal district court determined that, although "the prosecutor's remarks concerning Gongora's failure to testify amount to constitutional error," the so-called Griffin error[4] was harmless absent "any evidence in the record that his remarks 'had substantial and injurious effect or influence in determining the jury's verdict' as required for the granting of federal habeas relief." Gongora v. Quarterman, 498 F. Supp. 2d 919, 927 (N.D. Tex. 2007) (citation omitted) (emphasis added). "Gongora only argues in conclusory fashion that the jury struggled in reaching its verdict, because the state's case against him was weak . . . . Even if this were true, there is no evidence, substantial or otherwise, of a nexus between the prosecutor's improper remarks during argument and the jury's decisions." Id. (citation omitted) (emphasis added).

Some 5½ years after receiving Gongora's appeal, and 3½ years after oral argument, a sharply-divided panel of this court disagreed with both the TCCA and the district court. After determining that the Fifth Amendment violation was not harmless, the majority granted the habeas petition and ordered that he "be released from custody unless within six months of the mandate of this court he is again brought to trial or the case is otherwise terminated by plea or other disposition under state law." Gongora v. Thaler, 710 F.3d at 283 (per curiam).

## II.

In Fry v. Pliler, 551 U.S. 112, 120 (2007), the Court clarified that Brecht "provides the appropriate standard of review when constitutional error in a state-court trial is first recognized by a federal court." Under that standard—applied, to different effect, by both the panel majority and Judge Owen's dissent—an error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (citation and internal

---

[4] See Griffin v. California, 380 U.S. 609 (1965).

quotation marks omitted). Courts applying Brecht to determine harmlessness must bear in mind why it provides "the appropriate standard": Fry teaches that the stricter Brecht standard "subsumes" the "more liberal" test articulated by AEDPA, under which "a federal court may not award habeas . . . unless [a state court's] harmlessness determination itself was unreasonable." Fry, 551 U.S. at 119–20 (citation omitted).

In Fry, the Court reasoned that Brecht had survived the subsequent enactment of AEDPA "because the purpose of AEDPA is to 'limit[ ] rather than expand [ ] habeas relief,' and Brecht is the more stringent standard." Burbank v. Cain, 535 F.3d 350, 357 (5th Cir. 2008) (quoting Fry, 551 U.S. at 119). "That is to say, where an error is harmful under Brecht, any state court decision declaring it harmless must have unreasonably applied [clearly established federal law]. As a result, any error satisfying Brecht will also satisfy AEDPA's deference requirements." Bauberger v. Haynes, 632 F.3d 100, 104 (4th Cir. 2011) (Wilkinson, J.).

## III.

Because Gongora's Fifth Amendment claim fails under AEDPA, it necessarily cannot surmount the even stricter Brecht standard.[5] "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Richter, 131 S. Ct. at 786 (internal quotation marks omitted).

> As a condition for obtaining habeas corpus from a federal court, a
> state prisoner must show that the state court's ruling on the claim

---

[5] Although the TCCA did not specifically address the prosecutor's impermissible comments on collateral review, see Ex parte Gongora, 2006WL 3308713, at *1 (Tex. Crim. App. Nov. 15, 2006) (per curiam), AEDPA's relitigation bar nonetheless applies. See Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits. . . .").

being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87 (emphasis added) (citation and internal quotation marks omitted).

Here the AEDPA inquiry is easy, in part because fairminded jurists have disagreed. In thoughtful and detailed opinions, two federal judges (the district court and Judge Owen) have concluded the error was harmless; two federal judges (comprising the panel majority) have disagreed. No amount of hyperbole (nor a resort to the less familiar Brecht standard) can transform a close call by the state court into an "extreme malfunction[]," id. at 786, especially here, where the TCCA reasonably declined to find reversible error based on garbled comments, about Gongora's failure to testify, that the jury was repeatedly instructed to disregard. In concluding otherwise, the panel majority maintains the incoherent position that, although fairminded jurists could disagree regarding harmlessness, Gongora is somehow entitled to relief under a standard that is even stricter than that required by AEDPA.

## IV.

Measuring Gongora's claim against AEDPA illustrates just how blatantly the majority misapplied Brecht: Because the error was not harmful under AEDPA, it cannot be harmful under the definitionally "more stringent" Brecht standard. Burbank, 535 F.3d at 357; see also Bauberger, 632 F.3d at 104. Moreover, although Fry, 551 U.S. at 120, determined that Brecht provides an "appropriate standard of review," Fry does not bar a court from considering AEDPA. "Per that case, a habeas court remains free to, before turning to Brecht, inquire

whether the state court's [harmlessness] analysis was reasonable. If it was reasonable, the case is over."[6]

In analyzing the interplay of AEDPA and Brecht, it is important to bear in mind the asymmetry inherent in Fry, in which the court of appeals had denied habeas relief under Brecht, and the petitioner alleged that it was error for the court not to have also evaluated his claim under AEDPA. The Supreme Court determined that Fry's claim "makes no sense," because its rejection under Brecht necessarily implied rejection under "the more liberal AEDPA[] standard[.]" Id.

In sum, Fry boldly stands for the proposition that a habeas court is not required "formal[ly] [to] appl[y]" both AEDPA and Brecht, because "the latter obviously subsumes the former." Id. Nothing in that case precludes a court from applying AEDPA to deny habeas relief or as part of a two-step analysis.[7] Even a brief consideration of AEDPA, arguendo or otherwise, casts the inadequacy of Gongora's Fifth Amendment claim into sharp relief.

## V.

It follows that Gongora's claim fails under Brecht, a result that is reinforced by considering whether the prosecutor's comments "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (citation and internal quotation marks omitted). Because Judge Owen has persuasively analyzed Gongora's claim under Brecht, see Gongora, 710 F.3d

---

[6] Ruelas v. Wolfenbarger, 580 F.3d 403, 413 (6th Cir. 2009). Another circuit has concluded that, where Brecht applies, AEDPA's "'unreasonable application of [clearly established federal law]' standard does not survive Fry." Wood v. Ercole, 644 F.3d 83, 94 (2d Cir. 2011). That view contradicts the plain language of Fry, 551 U.S. at 119, which expressly reaffirmed the AEDPA standard as articulated by Mitchell v. Esparza, 540 U.S. 12 (2003).

[7] See Ruelas, 580 F.3d at 413; see also Johnson v. Acevedo, 572 F.3d 398, 404 (7th Cir. 2009) (asserting that a habeas court must apply AEDPA before applying Brecht).

at 289–90 (Owen, J., dissenting), I offer only brief additional comments, drawn from a similar case in which the Supreme Court recently granted certiorari:

> The majority compounds its error by engaging in a form of possible-harm review that verges on a presumption of prejudice. This leniency appears both in its emphasis on dicta opining about the likelihood that juries draw adverse inferences, and in its ultimate finding of a "very real risk" of prejudice. Alas, the correct harmless-error standard does not permit such speculation, and neither does the undisputed evidence . . . .[8]

Under the "possible-harm review" conducted by the Sixth Circuit in Woodall and the instant panel majority—and exemplified by Judge Higginbotham's determined portrayal of key facts in the light most favorable to Gongora—"no error will ever be harmless because one can never know what led a jury to its decision and it is always possible that a jury based its decision on the alleged error in question. But that is not the standard under Brecht . . . ."[9] Not only did the evidence establish Gongora's guilt, but "[t]he trial judge, in addition to issuing curative instructions during the prosecutor's closing argument, admonished the jurors several times that they could not and must not consider Gongora's choice not to testify as evidence of guilt." Gongora, 710 F.3d at 289 (Owen, J., dissenting).

Judge Higginbotham's latest response dismisses the instructions to disregard as "anemic [and] routinized" without explaining why theySSfrom his reading of a long-cold recordSSwere ineffective. He further contends that finding the Griffin error harmless would "drain the right to silence of all meaning" (emphasis added). That hyperbolic assessment is difficult to square with Judge Higginbotham's observation that commenting on a defendant's silence was "long toler-

---

[8] Woodall v. Simpson, 685 F.3d 574, 586 (6th Cir. 2012) (Cook, J., dissenting), cert. granted sub nom. White v. Woodall, 133 S. Ct. 2886 (2013) (No. 12-794).

[9] Brief for Petitioner, 2012 WL 6762488, at *22, Woodall, 2013 WL 3213542 (No. 12-794).

ated" because the Fifth Amendment was interpreted, in accordance with its plain language, "only to forbid a defendant's coerced testimony."[10]

Judge Higginbotham's response also imbues the prosecutor's confused comments with almost talismanic significance: So great was their purported effect on the jury that, to Judge Higginbotham, they "infected every aspect of Gongora's trial." By far the better inference is that, after carefully weighing the conflicting evidence—and notwithstanding the Griffin error, which had no discernible impact on the strength of the prosecution's case—the jury, having heeded the trial court's instructions, concluded that Gongora was one of the two men who approached the victim before he was shot. Viewed in light of the deference owed to the fact-finder and to the state courts, the record compels the conclusion that "Gongora has not shown that the prosecutor's violations of the Fifth Amendment substantially influenced the jury's verdict that he was guilty of capital murder." Gongora, 710 F.3d at 290 (Owen, J., dissenting).

## VI.

In response to any suggestion that the panel majority's error in applying Brecht is not grounds for en banc review, I note that Judge Higginbotham has elsewhere opined that "[t]his is a court of error," and its refusal to consider matters en banc "leaves litigants at the mercy of panel roulette—the 'law' being the unchartered and legally indefensible view of two judges."[11] The Supreme Court itself, moreover, routinely engages in error-correction in the habeas arena.[12]

---

[10] See also Salinas v. Texas, 133 S. Ct. 2174, 2177 (2013) (Thomas, J., concurring) (internal quotation marks omitted) ("Griffin lacks foundation in the Constitution's text, history, or logic.").

[11] Huss v. Gayden, 585 F.3d 823, 832 (5th Cir. 2009) (Higginbotham, J., dissenting from denial of rehearing en banc).

[12] See, e.g., Nevada v. Jackson, 133 S. Ct. 1990 (2013) (per curiam); Marshall v. Rodgers, 133 S. Ct. 1446 (2013) (per curiam); Metrish v. Lancaster, 133 S. Ct. 1781 (2013); Parker
(continued...)

Because the Court reserves summary reversal for "matter[s] of sufficient national importance,"[13] it follows that any case evading AEDPA's relitigation bar§§to say nothing of Brecht's even more stringent standard§§"involves a question of exceptional importance."[14]

By declaring the error harmful under Brecht, the majority implicitly brands the determination of the TCCA as worse than unreasonable and the thorough analysis of two federal judges as beyond fairminded disagreement. Adding injury to insult, the panel majority not only has vacated Gongora's conviction but has done so after several years of deliberation. The prospect of retrial has dimmed with the passage of time and the death of the prosecution's key witness. There is a real possibility that Gongora will go free, despite having confessed. The panel majority "undermines the State[']s[ ] interest in finality and infringes upon [its] sovereignty over criminal matters." Brecht, 507 U.S. at 637.

In light of the panel majority's stubborn refusal to reconsider, the en banc court should grant rehearing, deny the Fifth Amendment claim under Brecht and AEDPA, and return the case to the panel for expedited consideration of Gongora's Eighth Amendment claim, which the majority did not reach. See Gongora, 710 F.3d at 273. Instead, the en banc court, with six judges disagreeing,[15] has declined to disturb a flagrant grant of relief that contravenes the principles of

---

[12] (...continued)
v. Matthews, 132 S. Ct. 2148 (2012) (per curiam); Wetzel v. Lambert, 132 S. Ct. 1195 (2012) (per curiam); Hardy v. Cross, 132 S. Ct. 490 (2011) (per curiam); Bobby v. Dixon, 132 S. Ct. 26 (2011) (per curiam); Cavazos v. Smith, 132 S. Ct. 2 (2011) (per curiam).

[13] Bd. of Educ. v. McKluskey, 458 U.S. 966, 973 (1982) (Stevens, J., dissenting).

[14] FED. R. APP. P. 35(a)(2). Summary reversal "usually reflects the feeling of a majority of the Court that the lower court result is so clearly erroneous, particularly if there is a controlling Supreme Court precedent to the contrary, that full briefing and argument would be a waste of time." EUGENE GRESSMAN ET AL., SUPREME COURT PRACTICE ch 5.12(a), at 344 (9th ed. 2007).

[15] Five of those six judges join in this dissent.

habeas review unambiguously articulated by the Supreme Court. I respectfully dissent from the denial of rehearing en banc.