NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0194n.06

**Case No. 17-3930**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Apr 13, 2018<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| TYRONE WARFIELD, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

BEFORE:    COLE, Chief Judge; WHITE and BUSH, Circuit Judges.

COLE, Chief Judge.  Ohio State Trooper Hartford knew three things about Tyrone Warfield before stopping his car.  He knew that Warfield, having recently exited a construction zone, was driving under the speed limit with both hands on the steering wheel.  He knew that Warfield had touched the lane line twice.  And he knew that Warfield was black.  From there, Hartford cast off on a freewheeling investigation that began with a supposed marked lane violation, moved to suspicions of drunk driving, then to suspicions of trafficking untaxed cigarettes, and then on to drugs.  The offense Warfield pleaded guilty to was even further adrift: the possession of gift cards re-encoded with stolen information.  Because the initial stop was not supported by probable cause or reasonable suspicion, we reverse the district court's denial of the motion to suppress and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Just after midnight, Trooper Hartford saw a car driving at a speed that, by his visual estimation, was under the 70-mile-per-hour speed limit. The car had passed through a construction zone, requiring slower speeds, about a mile from where Hartford was stationed. As the car passed, Hartford observed that the driver—later determined to be Warfield—was sitting upright and rigidly in his seat, staring straight ahead, and had his hands on the steering wheel at ten and two. His suspicions aroused (apparently) by the textbook careful driving, Hartford followed the car. He caught up to Warfield and paced the car at around 50 to 53 miles per hour. Hartford testified that in the two minutes he was following Warfield, he saw the car "weaving a little bit" (which he incorrectly describes as "veer[ing]") and that the car's tires touched the solid lane line and the hash line dividing the lanes. These lane touches, along with Warfield's slow driving, were the basis for the traffic stop. We need not just take Hartford's word on what happened: the traffic stop was recorded on a dash cam video.

After Warfield pulled over, Hartford took Warfield's information and asked him if he had been drinking. (He hadn't.) Hartford noticed that Warfield and his passenger were nervous— Warfield's hands were shaking as he handed Hartford his information. He also noticed eight cigarette cartons in the backseat. Smelling alcohol inside the car, Hartford grew more suspicious that Warfield was intoxicated and decided to perform a field sobriety test to determine whether Warfield was driving under the influence.

Before conducting the field sobriety test, Hartford asked Warfield about his travel plans. Warfield told Hartford that he was traveling from Chicago to visit relatives at an address in Cleveland. While he was still trying to determine if Warfield was intoxicated, Hartford inquired about the cigarette cartons. When asked, Warfield denied smoking "a lot" and told Hartford that

the passenger, his cousin Quinton Knox, had purchased the cigarettes. Hartford then conducted a horizontal gaze nystagmus test to determine if Warfield was drunk. Warfield passed the test "with flying colors." Suppression Hr'g Tr., R. 27, PageID 156.

At this point, Hartford knew that Warfield had been driving slowly and had touched the lane line twice, that he had eight cigarette cartons in his car, and that he was not intoxicated. Still, the stop continued. Hartford then spoke to Knox, asking for his identification and about his travel plans. Hartford also asked Knox about the cigarettes. He explained that they bought the cigarettes at a gas station in Chicago because they were cheap.

With Warfield's identification in hand, Hartford checked his driving information and for outstanding warrants by running his information through an internal law enforcement database. Hartford also requested a secondary criminal background check. Both sources showed that Warfield had no outstanding warrants or prior convictions.

The stop continued. Hartford next called Trooper Stroud and his drug dog, Dark, to the scene. Even though drug dogs are not typically used during DUI investigations, Hartford thought that the cigarettes plus Warfield and Knox's nervous body language and inconsistent answers to his questions were suspicious and indicated general criminal activity. This activity— "not necessarily drugs"—encouraged Hartford to "exhaust what options" he had "available to [him]." Suppression Hr'g Tr., R. 27 at PageID 165, 201. According to Stroud, this option, a drug dog walk-around, is exercised more frequently when the driver is a person of color. The dog was led around the car twice and did not indicate the presence of narcotics.

Now, Hartford knew that Warfield was not drunk, that he did not have any outstanding warrants, and that there were no illegal drugs in the car. Still, the investigation did not end. After returning Warfield's license, Hartford's attention returned to the cigarettes. He asked

Warfield where the cigarettes were purchased and if he could look in the trunk. Warfield said "no problem" and opened the trunk himself.

The trunk contained multiple cigarette cartons, including one that was purchased in Michigan. Because the turnpike from Chicago to Cleveland does not cross through Michigan, this discovery prompted Hartford to ask Warfield if he could search the car's passenger compartment. Warfield agreed. That search revealed many debit cards, credit cards, and gift cards. As a result, Warfield was charged with violating 18 U.S.C. § 1029(e)(2) and (e)(3), possessing counterfeit or unauthorized access devices. Warfield moved to suppress the evidence obtained during the traffic stop and subsequent search. The district court denied the motion because, in its view, Hartford had probable cause to stop Warfield's car for marked lane violations and reasonable suspicion to stop Warfield for driving under the influence. Soon after, Warfield entered a conditional guilty plea, preserving his right to appeal the denial of his motion to suppress. Warfield exercised that right, and this appeal followed.

## II. ANALYSIS

When reviewing the denial of a motion to suppress, we review the district court's legal conclusions de novo and factual findings for clear error. *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008) (internal citations omitted). We consider the evidence in the light most favorable to the government. *Id*.

### A. The Initial Traffic Stop

A traffic stop violates an individual's Fourth Amendment right to be free from unreasonable searches and seizures unless the stop is supported by probable cause to believe a traffic violation occurred or by reasonable suspicion of ongoing criminal activity. *Gross*, 550 F.3d at 582–83; *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 (6th Cir. 2004). If the

initial traffic stop was unlawful, the evidence and statements obtained from the illegal stop must be excluded as fruits of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Gross*, 550 F.3d at 583. Because there was no probable cause to stop Warfield for a marked lane violation nor reasonable suspicion of intoxicated driving, Trooper Hartford violated Warfield's Fourth Amendment rights in stopping his car.

**1. There Was No Probable Cause to Stop the Vehicle for a Marked Lane Violation**

Regardless of the officer's subjective motivations, a traffic stop is lawful if he has probable cause to believe a traffic violation occurred. *Gross*, 550 F.3d at 583. In other words, the officer must have reasonable grounds to believe that a violation occurred—a mere suspicion is not enough. *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc). That fact-dependent determination is made from the totality of the circumstances and includes a "realistic assessment of the situation from a law enforcement officer's perspective." *Id*. at 391–92.

Merely touching a lane line is not a violation of Ohio's marked lane statute. Trooper Hartford thus lacked probable cause when he stopped Warfield's car for a marked lane violation when Warfield's tires only touched the solid edge line and the hash line for the lane divider.

Ohio law requires that a vehicle "shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane . . . until the driver has first ascertained that such movement can be made with safety." Ohio Rev. Code Ann. § 4511.33. That law is not violated where, as here, a driver touches—but does not cross—the lane lines. *State v. Baker*, No. WD-13-074, 2014 WL 2700938, at *3 (Ohio Ct. App. June 13, 2014); *State v. Parker*, No. OT-12-034, 2013 WL 4041582, at *2 (Ohio Ct. App. Aug. 9, 2013). For that reason, touching the lane lines is insufficient probable cause to believe a

marked lane violation occurred. The district court's conclusion that touching the lane line was a violation of Ohio's marked lane statute is then incorrect.

Our decisions addressing a nearly identical Tennessee statute support our conclusion. *See* Tenn. Code Ann. § 55–8–123 (requiring that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane"). We held that there was no probable cause to believe a marked lane violation occurred under the Tennessee statute, even where the driver crossed the lane line, so long as it was an isolated incident without other erratic or improper driving. *Gross*, 550 F.3d at 583. In *Freeman*, for example, we found that there was no probable cause to stop a motor home that had weaved over the lane line and into the emergency lane for a few feet. *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). In *Gross*, we rejected the officer's assessment that "straddl[ing] two lanes for a few seconds while changing from one lane to the other" was a violation of Tennessee's marked lane statute. 550 F.3d at 583. The facts here do not compel a different conclusion under Ohio law. As the dash cam footage shows, Warfield barely touched the lane lines, much less crossed them.

## 2. There Was No Reasonable Suspicion to Stop Warfield for Intoxicated Driving

The government's alternative argument that Hartford had reasonable suspicion to suspect Warfield of driving while intoxicated fares no better. Of course, police may stop a vehicle when they have reasonable suspicion of an ongoing crime, such as drunk driving in jurisdictions where, like Ohio, that is a criminal offense. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007). But reasonable suspicion is a contextual inquiry that depends on the totality of the circumstances or "the whole picture." *Gaddis*, 364 F.3d at 771. "[T]he whole picture" here falls far short of the circumstances that would support reasonable suspicion of drunk driving.

The government is right to look at Warfield's driving in its entirety. But here the picture, or, more accurately, the dash cam video, is worth a thousand words. "[T]he whole picture" shows that Hartford could not reasonably have thought that Warfield was driving drunk. *See Gaddis,* 364 F.3d at 771.

The dash cam footage from the traffic stop shows, at most, that Warfield touched the lane lines on two occasions and slightly drifted within his lane. Because touching the lane line is not a violation of Ohio's traffic code, it cannot be evidence of intoxication in the same way that driving exactly at the speed limit cannot.

Likewise, the slight weaving captured on the dash cam video is also insufficient to reasonably suspect intoxication. Of course, certain erratic driving behaviors, such as "weaving all over the roadway," are strongly correlated with drunk driving. *Navarette v. California*, 134 S. Ct. 1683, 1690–91 (2014) (internal quotations omitted). But we have never held that weaving *within a lane* is enough to show intoxication without some other indicia of erratic driving. *See, e.g.*, *Gaddis*, 364 F.3d at 771, 766–67. In *Gaddis* we held that "weav[ing] twice to the left to touch the dividing line" in a short time span and the driver's position, "slumping to the right inside his car as he held the wheel," supported reasonable suspicion of drunk driving. *Id*. We also upheld a traffic stop for driving under the influence when the driver crossed two lanes of travel at once, straddled the right lane, and was weaving back and forth between the right lane and emergency lane. *United States v. Palomino*, 100 F.3d 446, 448 (6th Cir. 1996). And in *Little*, too, the driver's weaving was accompanied by unusually slow and fluctuating speed. *United States v. Little*, 178 F.3d 1297 (6th Cir. 1999) (unpublished). When these other indicia are missing, as we explained in *Freeman*, the "failure to follow a perfect vector down the highway" is not enough to suspect a person of driving while impaired. 209 F.3d at 466.

Warfield's driving was far from erratic—he was driving under the speed limit with his hands properly positioned on the steering wheel. Warfield's only mistake was his failure to follow a perfectly straight line down the highway. *Id.* at 466. This is insufficient to suspect Warfield of driving under the influence. A different holding would subject many of us to regular invasions of our privacy.

But wait, says the government: Aren't Warfield's slow speed and rigid position other indicia of drunk driving? We think not.

Warfield's speed was not illegal. Under Ohio Revised Code § 4511.22, it is a misdemeanor to travel "at such an unreasonably slow speed as to impede or block the normal and reasonable movement of traffic." Hartford testified that Warfield was not impeding traffic by driving around 50 miles per hour, and the dash cam footage corroborates this fact. Nor was it unreasonable for Warfield to be driving at this speed. The law does not require a driver to travel at exactly the posted speed limit. It is a limit, not a mandate. Additionally, Warfield's slow speed is easily attributable to driving through a construction zone, which Hartford knew about, less than a mile before the car was stopped. In *Little*, we explained that it was *unusually* slow driving that supported the belief the driver was drunk. 178 F.3d 1297 (emphasis added). And while innocent conduct can form the basis for reasonable suspicion, here, Hartford's knowledge of the construction zone weighs toward finding that Warfield's reduced speed was not indicative of drunk driving. *See Arvizu*, 534 U.S. at 277.

Warfield's "rigid position" with hands at ten and two is also insufficient to suggest that Warfield was driving drunk. We have held that such a position is "law-abiding behavior" and "cannot be the basis of . . . reasonable suspicion to stop a vehicle." *United States v. Dukes*, 257 F. App'x 855, 856 (6th Cir. 2007).

Three instances of lawful driving cannot, when viewed together, transform into illegal conduct. Thus, this case involves a suspicionless traffic stop where the officer initiated his interaction with Warfield based on legal driving. Because of this, Warfield argues that his vehicle was stopped because of his race. He bolsters this argument with Trooper Stroud's troubling revelation that drug dogs, like the one used during Warfield's traffic stop, are used more frequently when the driver is a person of color. An officer can stop a driver for whatever reason he wants so long as he can give an objective justification after the fact. *Whren v. United States*, 517 U.S. 806, 812–13 (1996); *United States v. Ferguson*, 8 F.3d 385, 388 (6th Cir. 1993) (en banc). That justification must include specific reasons for why the officer was suspicious that person was breaking the law. *See Whren*, 517 U.S. at 813. While the law allows pretextual stops based on minor traffic violations, no traffic law prohibits driving while black. The protections of the Fourth Amendment are not so weak as to give officers the power to over-police people of color under a broad definition of suspicious behavior.

Accepting the government's arguments that Warfield's driving was suspicious would drain the Fourth Amendment of any meaning. Here, the government argues that Warfield could be pulled over for, essentially, driving too cautiously. It finds fault in Warfield's "rigid position," yet in other cases the government justified a stop in part because the defendant was slouching. *Gross*, 550 F.3d at 580. It says that it may stop Warfield for driving below the speed limit, but the government has also argued that it can pull over a driver for driving a mere two miles per hour over the speed limit. *United States v. Akram*, 165 F.3d 452, 454 (6th Cir. 1999). And it says that Warfield's nervous, shaking hands are indicators of supposed criminal activity, even though it has also cited overly deliberate, rehearsed conduct as suspicious behavior. *See United States v. Hill*, 195 F.3d 258, 262 (6th Cir. 1999).

A driver's conduct need not be the Platonic ideal of good driving to avoid a stop by a police officer. Indeed, the Fourth Amendment allows "police officers to stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) (*abrogated by United States v. Noble*, 752 F.3d 509 (6th Cir. 2014), on other grounds); *Freeman*, 209 F.3d at 470–71 (Clay, J., concurring). But "we have a duty to see that the authority is not abused." *Mesa*, 62 F.3d at 162. A different result in this case would neglect our duty and would allow the police to stop you, demand your identification, check for outstanding warrants, and call for a drug dog—even if you are doing nothing wrong. The stop of Warfield's car was not supported by probable cause or reasonable suspicion of drunk driving.

**B. The Scope and Duration of the Stop**

While not necessary to our holding, we also find troubling the extension of the traffic stop to purportedly investigate trafficking in untaxed cigarettes with a drug sniffing dog. Even if the stop had been lawful, there was weak evidence of trafficking in untaxed cigarettes to extend the stop beyond the field sobriety test. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). While Ohio law prohibits retailing untaxed cigarettes, possessing eight cigarette cartons, which is all that Hartford could view in the back seat of the car, is not inherently illegal or even suspicious. *See* Ohio Rev. Code § 5743.112. And there is nothing in the record to suggest that Hartford could see that any of the cartons were missing the required tax stamps. Nor was this possession made suspicious by Warfield's statement that he did not smoke "a lot." The cigarettes could have been for Warfield or his passenger's personal consumption regardless of Warfield's smoking habit. It is common to purchase consumer items, including cigarettes, in bulk when they are available at a cheaper price.

More importantly, Hartford's suspicions of cigarette trafficking are undercut by his request for a drug sniffing dog. Hartford admitted that he called for a dog sniff when he did not suspect the presence of drugs and justified the sniff as "exhaust[ing] what options [were] available to [him]." Suppression Hr'g Tr., R. 27 *Id.* at PageID 165, 201. "An officer who pulls over and questions an erratic driver whom he reasonably believes to be intoxicated, for example, cannot, on that basis alone, investigate the driver for [tax] fraud." *United States v. Winters*, 782 F.3d 289, 303–04 (6th Cir. 2015). Here, by his own admission, Hartford did not suspect illegal drugs. He was investigating potential cigarette-tax fraud. The use of a drug dog—whose only function is to search for illegal drugs—makes this seem less like an investigation into untaxed cigarettes and more like a fishing expedition.

## III. CONCLUSION

Because the traffic stop was unmoored from the Fourth Amendment's requirements, we reverse the district court's denial of Warfield's motion to suppress and remand for further proceedings consistent with this opinion.